IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

PATRICK VENTURINI,

                Plaintiff,                            OPINION AND ORDER

    v.

                                                              15-cv-423-slc

CAROLYN COLVIN,
Commissioner of Social Security,

                Defendant.

---

      Plaintiff Patrick Venturini applied for Disability Insurance Benefits pursuant to Title II of the Social Security Act on April 25, 2011, alleging that he has been disabled by rheumatoid arthritis since September 17, 2010. After his claim was denied initially and on reconsideration, Venturini requested a hearing, which was held on January 14, 2014. The administrative law judge (ALJ) who presided at the hearing issued a decision on March 11, 2014, finding that Venturini was not disabled. Specifically, the ALJ found that, although Venturini's arthritis was severe, it was well-controlled with medication and it did not prevent him from performing work at the "medium" level of exertion, provided that this work did not require more than frequent handling and fingering. A vocational expert had testified at the hearing that a person with these abilities would be able to perform some of Venturini's past jobs as well as other jobs existing in significant numbers in the national economy. Relying on this testimony, the ALJ determined that Venturini was not disabled. That decision became the final decision of the Commissioner when the Appeals Council denied Venturini's request for review.

Venturini now seeks judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g).[1] He contests the decision on only two grounds: 1) The ALJ erred in rejecting the opinions of Venturini's treating rheumatologist (Dr. Fanopoulos) and a consultative examiner (Dr. Khan) whose reports Venturini says support a finding that he is capable of only sedentary work; and, 2) The ALJ ignored Venturini's work history when he evaluated Venturini's credibility. As discussed in more detail below, neither of these arguments provides a sufficient basis to reverse the Commissioner's determination.

This is not to say that the ALJ wrote an unassailable decision or that the court is convinced that the ALJ properly found that Venturini is not disabled. To the contrary, this court is troubled by certain aspects of the ALJ's decision, namely, his decision to adopt a medium residual functional capacity (RFC) instead of a light RFC as found by all of the non-examining agency physicians,[2] as well as the ALJ's failure to explain why he credited Venturini's testimony about his swollen hands but rejected other parts of his testimony, such as his testimony that he can lift only 10-15 pounds regularly. Venturini, however, is silent on these issues. Accordingly, in keeping with the rule that this court will not make a litigant's arguments for him, this opinion addresses only the two objections that Venturini has raised in his brief. *See 330 West Hubbard Restaurant Corporation v. United States*, 203 F.3d 990, 997 (7th Cir. 2000) ("[I]t is not the obligation of this court to research and construct the legal arguments open to parties, especially when they are represented by counsel."); *DeSilva v. DeLeonardi*, 181 F.3d 865, 867 (7th Cir.

---

[1] This case originally was assigned to District Judge James Peterson. Pursuant to the parties' consent, it was transferred to me on December 4, 2015.

[2] Venturini may made a tactical decision not to pursue this argument because the vocational expert testified that even with a RFC for light work, Venturini had transferable job skills that would allow him to make a vocational adjustment to light forklift jobs that exist in the national economy. AR 69.

1999) ("A brief must make all arguments accessible to the judges, rather than ask them to play archaeologist with the record."); *Barry Aviation, Inc. v. Land O'Lakes Municipal Airport Com'n*, 336 F. Supp.2d 792, 802 (W.D. Wis. 2005) (quoting *Central States, Southeast & Southwest Areas Pension Fund v. Midwest Motor Express, Inc.*, 181 F.3d 799, 808 (7th Cir. 1999) ("Arguments not developed in any meaningful way are waived."). *See also Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013) (rejecting as waived arguments not raised in the district court); *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000) ("[I]ssues that are not raised before the district court are waived on appeal.").

The following facts are drawn from the certified transcript of the administrative record, dkt. 7:

**FACTS**

**I. Background**

At the time of his administrative hearing, Venturini was 57 years old. He had worked continuously for 37 years, performing work as a machine operator, warehouse worker, automotive line worker and forklift operator. At the hearing, Venturini testified that he had stopped working because of physical limitations resulting from his rheumatoid arthritis, with which he had been diagnosed in December 2009. Venturini spent his time caring for his aging mother, with whom he lived in a single family home. His daily activities consisted of tending to his mother's personal care needs, taking her to appointments and cooking meals for the two of them. Venturini drove, grocery shopped, did light chores around the house and yard and used the computer occasionally. He said he could be active for about 45 to 60 minutes before needing a break. Venturini estimated that he could lift 10-15 pounds on a regular basis and up

3

to 50 pounds on occasion. Standing for prolonged periods of time caused his back to hurt for several days. His hands would swell up and hurt with activity such as walking, snow blowing or writing out Christmas cards.

## II. Medical Records and Opinions

Treatment records show that after Venturini was diagnosed with rheumatoid arthritis, he was prescribed a treatment regimen that included a Humira injection pen, Advil, hydrocodone-acetaminophen, Plaquenil, prednisone and a methotrexate injection. This regimen of medications was effective: at a follow up visit in September 2010, Venturini denied bone or joint symptoms or weakness, gait disturbance or cold intolerance, and he reported that he was exercising two to three times a week. His doctor, Stephen Rudisill, M.D., examined him and found no swelling and no motor or sensory deficits; Venturini's lab results were normal.

In May 2011, Venturini returned to see Dr. Rudisill with complaints of pain, decreased mobility, difficulty sleeping, swelling, tenderness and weakness. Venturini admitted that he had stopped taking his medications over the past year because he was concerned about side effects. Dr. Rudisill prescribed Prednisone and referred Venturini to a rheumatologist, Dr. Dimitrios Fanopoulos.

Venturini saw Dr. Fanopoulos on July 13, 2011. Venturini told Fanopoulos that he had been relatively stable until he stopped taking his medications over the past year. Venturini said his condition had deteriorated over the past five months and had become markedly worse over the two weeks before his visit; Venturini reported that he was having a lot of stiffness, pain in all joints and had difficulty sleeping, secondary to his pain. Dr. Fanopoulos noted significant

swelling, stiffness and limited range of motion in multiple joints and a weakened grip. He gave Venturini injections of Depo-Medrol and Toradol and restarted Venturini on arthritis medications.

Once again, Venturini's symptoms decreased and his condition improved when he took his medications as prescribed. At a follow-up visit on August 25, 2011, Dr. Fanopoulos found that Venturini was doing better and his pain score was only 1.5. On examination, Dr. Fanopoulos noted improvement in synovitis in all the joints with only mild puffiness, and improvement in mobility and grip strength. His impression was that Venturini had "[s]ignificant improvement on his present medication." Dr. Fanopoulos adjusted some of Venturini's medications and scheduled a follow up visit in two months. However, the records in the court file do not show that Venturini ever saw Dr. Fanopoulos again.

On November 2, 2011, Dr. Fanopoulos completed a Musculoskeletal Questionnaire on which he indicated that Venturini had significant work-related limitations. Reciting his findings from his initial examination on July 13, 2011, Dr. Fanopoulos reported that Venturini could: lift at most 10 pounds occasionally and five pounds frequently; stand and walk two hours and sit two hours a day, provided that he could alternate sitting and standing; and, use his hands occasionally for reaching, handling and fingering. Under these restrictions, Venturini would be able to perform sedentary work, at the most.

On December 5, 2011, Venturini saw Dr. Kauseruzzaman Khan, an internist, for an evaluation in conjunction with his application for Social Security disability benefits. Venturini reported that he was doing much better than in July, and that the medications had been effective in reducing his pain and swelling, but he still had pain in his hands and knees. Venturini

5

reported that he could stand for about 15-20 minutes and walk about 200 yards before he got a bad knee pain.  Dr. Khan detected mild swelling in the small joints of Venturini's hands and left hip; he noticed that Venturini walked slowly, and that Venturini did not have full range of motion in his neck, shoulders, hips or knees.  However, Venturini's hand grip and pinch strength were 5 out of 5, his muscle tone, power, coordination and reflexes were normal and he was able to tie and untie his shoe laces. and he could rise from lying to sitting and from sitting to standing without difficulty.  Dr. Khan described Venturini as having a "moderate" restriction in both hands and his left hip due to rheumatoid arthritis, but Dr. Khan did not explain what this meant in terms of Venturini's ability to perform work-related tasks.

At a follow-up appointment in December 2012 to discuss his lab results, Venturini reported that his symptoms were controlled.  At a primary care visit in April 2013, Venturini reported having arthritic low back pain for the past month, but the doctor's examination was largely normal.

In May 2013, Venturini sought treatment for weight gain, noting that he had gained 22 pounds when he restarted Prednisone.  Nurse Marilyn Malott recommended a controlled diet and to start walking five minutes each day, then adding more minutes every two weeks with the goal of maintaining regular exercise.  In December 2013, Venturini was seen for a routine visit by nurse Theresa Kauffman.  Venturini reported having pain in both knees that he rated a 3 on a scale of 10.  Prolonged activity aggravated the pain; rest helped.  Venturini said he had good and bad days and had intermittent joint swelling.  On examination, Kauffman noted no joint erythema or tenderness; Venturini's gait was normal.  Kauffman observed that Venturini's

6

symptoms were "well controlled with current management" and that his recent weight gain and pelvic inflammation were resolved.

Medical consultants hired by the local disability agency reviewed Venturini's medical records and self-reports about his activities and limitations in order to provide opinions about Venturini's work-related abilities. Dr. Pat Chan reviewed the record on December 15, 2011 and concluded that Venturini was capable of performing medium work from the date of his alleged onset until February 12, 2011, and was capable of performing light work from February 13, 2011 until December 15, 2011. Dr. Mina Khorshidi reviewed the record on May 8, 2012 and determined that as of September 2011, Venturini had the residual functional capacity for light work. A third agency consultant, Dr. Mary Payne, reviewed the record on October 22, 2012 and affirmed a residual functional capacity for light work.

### III.  ALJ's Decision

The ALJ evaluated Venturini's claim in accordance with the five-step process set out by the Social Security regulations, 20 C.F.R. § 404.1520(a). He determined that although Venturini had the severe impairment of rheumatoid arthritis, the evidence failed to show that it was equal in severity to any impairment that the Commissioner considers to be severe enough to prevent a person from doing any gainful activity. Therefore, the ALJ went on to evaluate Venturini's residual functional capacity, which is the commissioner's term for what a person can do both physically and mentally on a sustained basis in spite of limitations caused by his impairments. 20 C.F.R. §§ 404.1520(3); 404.1545. At this step, the administrative law judge concluded that Venturini retained the RFC to perform work at the medium level of exertion

(lifting 50 pounds occasionally, 25 pounds frequently, sitting 6 hours in an 8-hour day and standing 6-hours in an 8-hour day), but he was limited to frequent fine finger manipulation and frequent gross handling.

Relying on the testimony of a vocational expert, the ALJ concluded that Venturini's residual functional capacity would not preclude him from performing his past relevant work as an automotive line worker, warehouse worker or machine operator, or from making a vocational adjustment to other jobs existing in significant numbers in the national economy. Accordingly, the ALJ found that Venturini was not disabled.

## OPINION

### I. Standard of Review

A federal court reviews an administrative law judge's decision deferentially: the court is to uphold the ALJ's decision to deny of benefits unless this decision is not supported by substantial evidence or is based on an error of law. 42 U.S.C. § 405(g); *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A reviewing court cannot reconsider facts, re-weigh the evidence, decide questions of credibility, or otherwise substitute its own judgment for that of the administrative law judge. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Where conflicting evidence allows reasonable minds to differ about whether a claimant is disabled, the responsibility for that decision falls on the commissioner, or the commissioner's designate, the [administrative law judge]." *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990) (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987) (citation omitted).

## II. Residual Functional Capacity

Venturini argues that the ALJ should have found that Venturini was capable of performing only sedentary work based upon the opinion of Dr. Fanopoulos, his treating rheumatologist. Because Venturini is of "advanced age," a finding that he could perform no more than sedentary work would direct a finding of disabled pursuant to the Commissioner's Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, which are commonly referred to as the "grids."

As Venturini points out, the Social Security Regulations set out rules for ALJs to follow when evaluating medical opinions. Generally, the ALJ must give "controlling weight" to the medical opinion of a treating physician "if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence.'" *Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010) (quoting 20 C.F.R. § 404.1527(c)(2)). However, if well-supported contradicting evidence is introduced, then the treating physician's opinion no longer is entitled to controlling weight and the ALJ is to weigh it along with the other medical evidence in the record, taking into account factors such as the length of the treatment relationship, frequency of examination, consistency, supportability and the physician's specialty. 20 C.F.R. § 404.1527(c). The ALJ must provide "good reasons" for the weight given to a treating source's opinion. § 404.1527(c)(2).

Here, the ALJ determined that Dr. Fanopoulos's opinion was not entitled to much weight because he offered it after seeing Venturini on only two occasions, when Venturini had recently restarted his arthritis medications after a prolonged period without them. The ALJ noted that after Venturini restarted his medications, his condition continued to improve, such that when he subsequently visits other providers, he showed good range of motion, normal strength and

9

normal joint appearance. The ALJ also noted that Dr. Fanopoulos's opinion was inconsistent with those of the state agency physicians, all of whom who concluded that Venturini was capable of performing more than sedentary work.[3]

These were sound reasons for the ALJ to give little weight to Dr. Fanopoulos's opinion. That opinion was contradicted by later medical notes showing a significant reduction in the swelling and stiffness documented by Dr. Fanopoulos on the Musculoskeletal Questionnaire. Further, Dr. Fanopoulos did not have a long-term treatment relationship with Venturini, having seen him only twice. The ALJ was entitled to give little weight to an opinion that did not account for Venturini's significant improvement after he had recommended his medication regime, and he was entitled to give more weight to those opinions that provided a longitudinal assessment of Venturini's condition. It is true, as Venturini points out, that Dr. Fanopoulos was a specialist,[4] but this fact alone does not suffice to outweigh the other factors that detracted from Dr. Fanopoulos's opinion, namely, his limited contact with Venturini and failure to consider the subsequent improvement in Venturini's condition.

Venturini argues that the ALJ's rationale for rejecting Dr. Fanopoulos's opinion is inconsistent with his decision to give more weight to the opinion of Dr. Khan. Venturini correctly points out that Dr. Khan evaluated Venturini only one month after Dr. Fanopoulos gave his opinion; therefore, argues Venturini, it made no sense to give Dr. Khan's opinion greater

---

[3] As noted at the beginning of this order, Venturini does not argue that the ALJ should have made a RFC finding for light work, which the state agency physicians all found reflected Venturini's RFC after February 12, 2011 until the date they offered their respective opinions. (Although Dr. Chan did indicate that Venturini could perform medium work, his opinion was restricted to the time period from September 17, 2010 to February 12, 2011.)

[4] Contrary to Venturini's suggestion, the ALJ noted that Dr. Fanopolous was a rheumatologist, which is enough to show that the ALJ properly considered Dr. Fanopoulos's speciality when he evaluated the doctor's opinion. *See* 20 C.F.R. § 404.1527(c)(5).

weight, because it was offered around the same time frame. It's a valid point, but it fails to establish that the ALJ lacked sound reasons for rejecting Dr. Fanopoulos's opinion. For one thing, Dr. Khan's opinion did not conflict directly with Dr. Fanopoulos's: Dr. Khan said only that Venturini had "moderate" restriction of both hands and the left hip without translating that limitation into work abilities.[5] For another thing, the ALJ said he was giving only "some" weight to Dr. Khan's opinion, noting, as he did with Dr. Fanopoulos, that it was entitled to limited weight because Venturini was only six months into his restarted medication regime when he saw Khan. In other words, the ALJ applied the same reasoning to both doctors' opinions and did not give either of them much weight.

Next, Venturini argues that the ALJ was mistaken in concluding that Venturini's condition improved after his visits with Dr. Fanopoulos. Venturini points to later medical notes documenting his complaints of back pain, knee pain and intermittent joint swelling, asserting that "<u>at best</u>, . . . [Venturini's] overall condition remain[s] the same through the date of the last treatment note of record[.]" Br. in Supp., dkt. 11, at 10 (emphasis in original). Venturini's assertion lacks substantial support in the record. At his consultative visit with Dr. Khan, Venturini presented with only some mild swelling in the small joints of his hands and left hip and he reported improvement on his medications. In December 2012, he had no soft tissue swelling. In December 2013, nurse Kauffman's examination of Venturini was largely normal. Although it is true that Venturini is not symptom-free and continued at times to report pain,

---

[5] Venturini also appears to argue that Dr. Khan's report supported a finding that Venturini could do at most sedentary work because Dr. Khan "did not challenge [Venturini's] self-description that [Venturini's] pain became worse within less than a half an hour of light activity." Br. in Supp., dkt 11, at 7. I disagree. There is simply no way to discern from Dr. Khan's report what he thought of Venturini's alleged symptoms or what level of work he thought Venturini was capable of performing.

11

limitations on his activities and intermittent joint swelling, overall the record adequately supports the ALJ's conclusion that Venturini's condition improved after his last visit with Dr. Fanopoulos.

Finally, Venturini argues that the ALJ should have developed the record further by calling a medical expert or by sending Venturini for a consultative examination to determine the extent to which his symptoms had improved in the years after his visits with Dr. Fanopoulos. This argument is not persuasive. An ALJ needs to recontact a medical source or otherwise develop the record only when there is insufficient evidence to determine disability. 20 C.F.R. § 404.1520b(b)-(c); *see also Nelms v. Astrue*, 553 F.3d 1093, 1098-99 (7th Cir. 2009) ("This court generally upholds the reasoned judgment of the Commissioner on how much evidence to gather . . ."). The record before the ALJ in this case, although not voluminous, contained evidence of several visits to physicians or nurses who examined Venturini while he was taking his medications, as well as three opinions by state agency physicians. This was sufficient evidence upon which to evaluate Venturini's claim.

## III. Credibility

Finally, Venturini argues that the ALJ's credibility assessment is flawed because he failed to consider Venturini's lengthy and consistent work history as a "credibility enhancing" factor.[6] It is true that a claimant's work history is one among many factors an ALJ is to consider when evaluating the credibility of a claimant's statements about his pain or other symptoms, SSR

---

[6] This is the only argument developed in Venturini's brief. Although he alludes to a "general challenge" to the ALJ's credibility finding, Br. in Supp., dkt. 11, at 11, he offers no arguments in support of such a challenge. As a result, he has waived any argument in opposition to the credibility finding apart from the ALJ's assessment of his work history and the medical source evidence.

96–7p, 1996 WL 374186, at *5 ("Assessment of the credibility of an individual's statements about pain or other symptoms . . . includes, but is not limited to: . . . prior work record and efforts to work . . ."), and that a claimant's good work record supports an inference that the claimant stopped working for the reasons that he testified to. *See Shumaker v. Colvin*, 632 Fed. Appx. 861, 866-67 (7th Cir. Dec. 10, 2015) (nonprecedential disposition). However, "work history is just one factor among many, and it is not dispositive." *Id*. at 867.

Here, although the ALJ did not specifically mention Venturini's work history in his credibility assessment, his citation to an earnings report in his decision and consideration of Venturini's past work indicates that he was aware of it. Ultimately, however, the ALJ concluded that Venturini's allegation of total disability was not credible in light of the medical evidence, which showed that Venturini's arthritis was well-controlled on medication and in light of Venturini's daily activities, which he described as a "wide array of normal daily activity," including cooking, cleaning, reading, watching television, driving, shopping, caring for his mother, doing light chores around the house and going out to eat. Venturini does not challenge the ALJ's analysis of his daily activities, and as already discussed, substantial evidence in the record supports the ALJ's conclusion that Venturini's symptoms were well-controlled on medication. Accordingly, because the ALJ explained his credibility finding with specific reasons that are either supported by the record or are unchallenged, I find no basis to remand this case and send it back to the commissioner for a new credibility assessment that mentions Venturini's work history. *See Minnick v. Colvin*, 775 F.3d 929, 937 (7th Cir. 2015) (ALJ must competently explain adverse credibility finding with specific reasons supported by the record).

**ORDER**

IT IS ORDERED THAT the decision of the Commissioner of Social Security denying plaintiff Patrick Venturini's application for Social Security disability benefits is AFFIRMED. The clerk of court is directed to enter judgment in favor of the Commissioner and close this case.

Entered this 23rd day of May, 2016.

BY THE COURT:

/s/

STEPHEN L. CROCKER
Magistrate Judge